**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MAURICE C. WASHINGTON, | ) | CASE NO. 3:23-CV-01455-JDA |
| Plaintiff, | ) | |
| | ) | **U.S. MAGISTRATE JUDGE** |
| v. | ) | **JENNIFER DOWDELL ARMSTRONG** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant, | ) | |
| | ) | |

## I.    INTRODUCTION

Plaintiff, Maurice C. Washington ("Mr. Washington") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying his application for Disability Insurance Benefits ("DIB"). (ECF No. 1.) This matter is before me pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1. (ECF No. 9.) For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Mr. Washington's DIB application.

## II.    PROCEDURAL HISTORY

On November 22, 2020, Mr. Washington filed an application for DIB, alleging a disability onset date of December 19, 2019; however, he subsequently amended the alleged disability onset date to June 30, 2020. (Tr. 177-86, 196.)[2] He alleged disability due to diabetes, chronic depression, chronic foot pain, clinical psychiatric problems, excessive weight loss, and a learning disability.

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023.
[2] The administrative transcript ("Tr.") appears at ECF No. 6 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record references are to the electronically stamped CM/ECF document ("ECF No.") and PageID# rather than any internal pagination.

(Tr. 22, 198, 218, 228.) His application was denied initially and upon reconsideration. (Tr. 95-105.) On July 18, 2022, an administrative law judge ("ALJ") held an administrative hearing, where Mr. Washington, represented by counsel, and a vocational expert ("VE") testified. (Tr. 34-65.) The ALJ issued a written decision on July 29, 2022, finding Mr. Washington not disabled within the meaning of the Social Security Act. (Tr. 17-27.) The ALJ's decision became final on June 1, 2023, when the Appeals Council declined further review. (Tr. 1-6.)

On July 26, 2023, Mr. Washington filed his Complaint, challenging the Commissioner's final decision. (ECF No. 1.) Mr. Washington asserts the following assignments of error:

(1) Whether the administrative law judge's finding concerning residual functional capacity is supported by substantial evidence where the administrative law judge ignored aspects of opinion evidence that documented further limitation on Mr. Washington's ability to work?

(2) Whether the administrative law judge's finding concerning residual functional capacity is supported by substantial evidence where the administrative law judge failed to consider the impact of Mr. Washington's symptoms of paranoia on his ability to interact with others?

(ECF No. 7, PageID#756.)

## III.    BACKGROUND[3]

### A.  <u>Personal, Educational, and Vocational Information</u>

Mr. Washington was born in 1995, and he was 24 years old on the alleged disability onset date. (Tr. 25, 34, 184.) He lives with his mother and sister. (Tr. 39.) He has a driver's license. (Tr. 40.) He is a high school graduate. (Tr. 42.) His past relevant work was employment as a stock clerk, setup mechanic, and cashier. (Tr. 25, 60-61, 199.)

---

[3] Mr. Washington's assignments of error solely relate to the ALJ's assessment of his mental impairments. Accordingly, the Background section is limited to facts related to Mr. Washington's mental impairments.

### B.  **Relevant Non-Medical/Medical Opinion Evidence**

#### 1.  *John Reece, Psy.D.*

In September 2021, Dr. Reece performed an online video interview with Mr. Washington. (Tr. 549-55.) Mr. Washington reported that he listens to music with headphones when he feels anxious. (Tr. 551.) He stated that he thinks "others are watching, discussing, and plotting against him, causing him to 'suffer.'" (Tr. 551.) Mr. Washington explained that he believed that his parents were "'trying to make [him] sicker or change [him] by force by interacting with his doctors." (Tr. 552.) He reported no obsessive thoughts or compulsive behaviors but reported a concern for cleanliness. (*Id.*) Dr. Reece observed that Mr. Washington was passively cooperative and did not demonstrate eccentric or impulsive behavior. (*Id.*) However, Dr. Reece observed that Mr. Washington had inconsistent eye contact, minimal facial and gestural expressiveness, monotone voice, and mild psychomotor retardation. (*Id.*) Mr. Washington displayed no agitation or outward signs of anxiety. (*Id.*) Dr. Reece further observed that Mr. Washington spoke "insecurely to directly" and was generally understandable. (Tr. 553.) Mr. Washington would often pause before responding, which Dr. Reece noted gave an impression of defensiveness. (*Id.*) Mr. Washington's quality of associations was well-organized to concrete at times and tangential at other times. (*Id.*) Mr. Washington displayed flat affect and dysphoric, anxious mood. (*Id.*)

Dr. Reece diagnosed Mr. Washington with unspecified mood disorder, unspecified trauma and stressor-related disorder, and schizotypal personality traits. (Tr. 554.) In the area of understanding, remembering, and carrying out instructions, Dr. Reece stated that Mr. Washington "was able to follow directions in the exam" and reported no problems retaining instructions, but he was slow to comprehend oral instructions in his past workplace. (Tr. 555.) In the area of maintaining attention and concentration, persistence, and pace, Dr. Reece stated that Mr.

Washington had no difficulty with concentration in the exam and reported no problems in his past workplace. (*Id.*) In the area of responding appropriately to supervision and to coworkers in a work setting, Dr. Reece noted that Mr. Washington reported a "history of minimal relationships," is assessed as having schizotypal personality traits, and reported no problems in his past workplace. (*Id.*) Finally, in the area of responding to work pressures in a work setting, Dr. Reece noted that Mr. Washington reported having "some to minimal social supports" and no problems in his past workplace. (*Id.*) Dr. Reece stated that Mr. Washington's "current deficits in dealing with stress and pressure in the workplace are emotional instability, anxiety, and depression." (*Id.*)

### 2. *State Agency Psychological Consultants*

In September 2021, Bruce Lipetz, Psy.D., reviewed the record at the initial level of consideration. Dr. Lipetz found that Mr. Washington had mild limitations in his ability to understand, remember, or apply information, and moderate limitations in his ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 71.) He further found that Mr. Washington could understand and remember simple and some lower level detailed instructions; could sustain simple, basic work-like tasks that could learned in a brief period of time and carried out without demands for rapid task completion or production speeds as would occur in assembly work; would not do well in a customer service position, but was able to get along with others and could sustain contact with co-workers and supervisors; and could adapt to a setting with demands for basic work activity where he sustained a regular schedule. (Tr. 71-72, 75-77.) Dr. Lipetz recommended that Mr. Washington obtain assistance from vocational rehabilitation to find appropriate work activity due to his limited ability to engage in future planning. (Tr. 76.) In November 2021, Karla Delcour, Ph.D., reviewed the record at the reconsideration level and affirmed Dr. Lipetz's findings. (Tr. 81-82, 85-87.)

C.  **Relevant Medical Evidence**

On September 16, 2020, Mr. Washington went to the emergency room for a broken toe sustained while he was working as an Amazon driver. (Tr. 268-74.) Kathleen Martinelli, PA-C, observed that Mr. Washington had pleasant behavior with a normal mood, affect, and speech. (Tr. 269, 273.)

From November 28, 2020, to December 18, 2020, Mr. Washington was hospitalized after he presented to the emergency room following a suicide attempt by overdose the previous night. (Tr. 330-59.) He reported new stressors of job loss due to the COVID-19 pandemic and pending homelessness. (Tr. 330.) He denied current use of psychotropic medications or treatment with a psychiatrist. (Tr. 330.) In addition to symptoms of depression and anxiety, Mr. Washington endorsed some paranoia that resulted in difficulty trusting people. (Tr. 330-31.) He stated that he absorbed a lot of negative information from being around family and friends, which caused him anxiety and distress. (Tr. 331.) Lenita Haxhiu-Erhardt, MD, diagnosed Mr. Washington with severe major depressive disorder with anxious distress and psychotic features (paranoia), as well as post-traumatic stress disorder. (Tr. 345.) Mr. Washington's mental status examination at discharge revealed passive engagement in the interview with inconsistent reports; full orientation; mumbling speech at times; organized and linear thought process; tight associations; no paranoia; poor judgment and insight; tired mood; flat affect; and no suicidal ideation, intent, or plan since the day of his overdose. (Tr. 345.) Mr. Washington was discharged on a medication, Haldol, for paranoia. (Tr. 345.)

On January 19, 2021, Mr. Washington sought treatment at Harbor Behavioral Health, after relocating to Toledo to live with his mom and siblings. (Tr. 453-63.) He reported that he was recently suicidal after his cousin's girlfriend kicked him out, which caused him to be homeless.

(Tr. 453.) He stated that his mom's house was a toxic place for him, so he stayed in his bedroom to avoid the bad atmosphere. (Tr. 461.) He reported activities including playing video games, making music, and watching shows on his computer. (Tr. 454.) He described a history of neglect and being bullied, sexual abuse by his stepmother, physical abuse by his mother's side of the family, and emotional abuse. (Tr. 456.) A mental status examination revealed that Mr. Washington was fully oriented with good grooming and hygiene, avoidant eye contact, cooperative/pleasant behavior, normal speech, and no observed psychomotor problems. (Tr. 453.) He had an anxious mood and constricted affect with logical thought processes (no paranoia) and fair insight and judgment. (Tr. 453-54.)

Mr. Washington continued to receive treatment and services from Harbor Behavioral Health from January 2021 through April 2022. (Tr. 464-548, 557-614.) At a January 25, 2021, appointment, Mr. Washington reported needs such as enrolling in Social Security, potential housing opportunities, and additional support to increase daily functioning. (Tr. 464.) He further reported that he was unable to connect with anyone and had some conflict with his mother, with whom he lived. (*Id.*)

Mr. Washington had a psychiatric video evaluation with Amy Mossing, CNP, on February 1, 2021. (Tr. 470.) He reported that he had run out of Haldol three days earlier. (Tr. 471.) He stated that Haldol helped some but had a sedating effect. (Tr. 475.) He also reported "a significant medication trial history with poor response and/or non-adhere[nce]." (*Id.*) He believed his problems stemmed from his environment with "significant abuse in the past." (*Id.*) He further reported anxiety symptoms, with racing thoughts, tapping his phone, playing with his hair, scratching until his skin bleeds, and excessive handwashing even before the COVID-19 pandemic. (Tr. 476.) He also reported that he cannot sit still if he is not playing video games. (*Id.*) Upon

mental status examination, Mr. Washington had poor articulation when speaking, sad and anxious mood, dysphoric and constricted affect, and poor concentration. (Tr. 472.) He had loose associations, visual hallucinations, and delusions. (Tr. 473.)

The mental status examination on February 17, 2021, appointment revealed that Mr. Washington had sad mood/affect but unremarkable thought process/orientation. (Tr. 483.) Mr. Washington reported that things had been difficult with his mother and that he thought he would have to move out that week. (*Id.*) Megan Gibson, LPC, discussed resources for housing and encouraged Mr. Washington to call the Medicaid cab to ensure transportation to his upcoming appointments. (*Id.*)

On March 1, 2021, Mr. Washington reported that he was unsure about when he would be moved out of his current living environment due to the date changing frequently. (Tr. 487.) He attributed this uncertainty to his mother's "mood/tendencies." (*Id.*) His mental status examination revealed unremarkable mood/affect, thought process/orientation, and behavior/functioning. (*Id.*)

At a medication management visit with Ms. Mossing that same day, Mr. Washington reported that he was taking Haldol daily. (Tr. 499.) He reported that Haldol "may be helping to keep [him] out of the hospital" but he declined to elaborate. (*Id.*) Ms. Mossing noted that it appeared Haldol was not effective, but also noted that "it [was] not surprising" because Mr. Washington was only taking 1 mg, which is a "rarely effective dose." (*Id.*) Mr. Washington reported continued depression, anxiety, and isolating in his bedroom with anxiety and paranoia. (*Id.*) Ms. Mossing increased Mr. Washington's Haldol dosage and added Prozac. (*Id.*) His mental status examination revealed psychomotor retardation; sad and anxious mood; unemotional affect; and poor concentration. (Tr. 493.) Ms. Mossing noted abnormal thought process in the form of persecution. (*Id.*) His thought content was paranoid and delusional, and he had tangential

7

associations. (Tr. 493-94.) Psychosis/disturbance of perception was evidenced by delusions. (*Id.*) His insight and judgment were poor. (Tr. 494.) Ms. Mossing added a diagnosis of paranoid personality disorder, noting that Mr. Washing was "distrusting and suspicious of [people] and family in particular." (Tr. 495). Ms. Mossing further noted that Mr. Washington reported that he stays in his room at all times and comes out only for food and medicine. (*Id.*) She indicated that Mr. Washington's functioning "appears markedly impaired" and there "appears to be problems with close relationships." (*Id.*)

On March 4, 2021, Mr. Washington reported feeling frustrated because he had not been able to get transportation even when calling the Medicaid cab to appointments. (Tr. 503.) He denied picking up his medication from the pharmacy due to limited transportation. (*Id.*) His mental status findings revealed stressed mood but unremarkable thought process/orientation and behavior/functioning. (*Id.*) The following day, Mr. Washington's mental status findings revealed he had stable mood/affect; was attentive to questions; and had unremarkable behavior/functioning. (Tr. 506.)

A March 10, 2021, treatment note indicated that Mr. Washington had stable mood/affect, was attentive to questions, and had unremarkable behavior/functioning. (Tr. 508.) Mr. Washington met with Ms. Gibson on March 16, 2021. Ms. Gibson noted that Mr. Washington was hoping to look for a new car, and that his uncle planned on providing transportation for him to do so. (Tr. 509.) His mental status findings revealed hopeful mood/affect, unremarkable thought process/orientation, and unremarkable behavior/functioning. (*Id.*) His remaining sessions from March 2021 had mental status findings indicating that he had stable mood/affect, was attentive to questions, and had unremarkable behavior/functioning. (Tr. 511-15.)

At a case management appointment April 29, 2021, Mr. Washington displayed flat, down, and "seeming sad" mood/affect. (Tr. 521.) Lia Bias, LSW, noted that Mr. Washington was "sometimes negative" and complained about taking his medications. (*Id.*) He had normal functioning. (*Id.*)

On May 11, 2021, Mr. Washington reported irritability "where he identified limited communication as his current salutation." (Tr. 523.) He reported that he was able to get temporary tags for his car. (*Id.*) Regarding the mental status findings, for mood/affect, Ms. Gibson noted Mr. Washington's report that he thought his mood was getting worse. (Tr. 523.) The mental status findings were unremarkable. (*Id.*) Mr. Washington's mental status findings from his May 17, 2021 and May 27, 2021 case management appointments were also unremarkable. (Tr. 525, 527.)

On June 2, 2021, Mr. Washington's mental status findings revealed flat mood and affect, but unremarkable thought process/orientation and behavior/functioning. (Tr. 529.) Ms. Bias noted that despite Mr. Washington's flat mood, he was able to communicate and "effectively figure out what he needed." (Tr. 530.) His mental status findings remained the same from June 18, 2021, through July 16, 2021 (Tr. 531, 533 535.) However, at another appointment on July 16, 2021, Pamela Roberts, QMHS, noted Mr. Washington's mood/affect as "very tired" but his thought process/orientation and behavior/functioning was unremarkable. (Tr. 537.)

The treatment notes from July 30, 2021, indicate that Mr. Washington had flat mood and affect, goal-directed thought process/orientation, and "tired" behavior/functioning. (Tr. 557.) On August 6, 2021, he had flat mood and affect but unremarkable thought process/orientation and behavior/functioning. (Tr. 559.) Mr. Washington displayed a flat mood and affect and goal-directed thought process/orientation but otherwise unremarkable behavior functioning throughout August 2021. (Tr. 561, 563.)

9

On September 9, 2021, Ms. Gibson noted that Mr. Washington presented as cheerful. (Tr. 565.) He reported that he continued to experience anger regarding others and said that he was coping with this anger by listening to music. (*Id.*) Ms. Gibson observed that Mr. Washington had euthymic, cooperative mood/affect and unremarkable thought process/orientation. (*Id.*) Ms. Gibson noted that Mr. Washington had "remarkable" behavior/functioning, which she explained as "irritability towards others per [Mr. Washington's] report." (*Id.*)

On October 4, 2021, Mr. Washington had flat mood/affect, goal-directed thought process/orientation, and "tired, flat" behavior/functioning. (Tr. 569.) Mr. Washington met with Ms. Mossing on October 8, 2021, for a medication management visit. He displayed psychomotor retardation; speech and language within normal limits; sad and anxious mood; dysphoric affect; poor concentration; delusional and paranoid thought content with tangential associations; no suicidal or homicidal ideation/intent; and poor insight and judgment. (Tr. 574-75.) Mr. Washington reported thoughts of people "trying to take advantage of him, out to get him, making him do what they want." (Tr. 576.) He stopped his medications because he believed "[people] want to control him with meds." (*Id.*) Ms. Mossing started Mr. Washington on Caplyta. (Tr. 579.)

On October 15, 2021, Mr. Washington displayed flat mood and affect. (Tr. 587.) Regarding Mr. Washington's thought process/orientation, Ms. Bias noted that he was "confused at times" but was "able to understand important and significant issues." (*Id.*) He also demonstrated calm behavior. (*Id.*) Three days later, Mr. Washington displayed flat mood/affect and "tired, flat" behavior/functioning, but goal-directed thought process/orientation. (Tr. 589.) The following day, Mr. Washington displayed flat mood/affect and guarded behavior but unremarkable thought process/orientation. (Tr. 591.) Jade Branch, LPC, noted that Mr. Washington was not very vocal at this session and shared that his family does not feel like there is anything wrong with them and

that his family wants him to talk to someone. (Tr. 592.) He expressed that his family "only wants him on earth for money." (*Id.*) He reported isolating himself and staying in bed and not eating, which he indicated that he has been doing since he was a child. (*Id.*)

On November 9, 2021, Ms. Jade noted that Mr. Washington had appropriate mood and affect for the session. (Tr. 593.) However, Mr. Washington also demonstrated guarded thought process/orientation and avoidant behavior/functioning. (*Id.*) Ms. Jade noted that Mr. Washington was unable to share how he was feeling and avoided questions when asked. (Tr. 594.) At an appointment on December 6, 2021, Mr. Washington had unremarkable mood/affect and thought process/orientation but agitated behavior/functioning. (Tr. 601.)

On January 6, 2022, Mr. Washington had calm mood/affect, thought process/orientation and behavior/functioning within normal limits, and stable medical condition. (Tr. 603.) At a counseling appointment on January 20, 2022, Ms. Branch noted that Mr. Washington presented with appropriate mood and affect for the session. (Tr. 605.) She observed that Mr. Washington had unremarkable mood/affect; unremarkable thought process/orientation; and "agitated" behavior/functioning. (*Id.*)

Mr. Washington attended a therapeutic behavioral services appointment on January 26, 2022. He had "hopeless" mood and "sleepy" thought process/orientation but cooperative behavior/functioning. (Tr. 607.) Twanda Harris, QMHS, a community psychiatric support treatment worked, met with Mr. Washington on the field to assist in accessing community resources. (Tr. 612.) The mental status findings indicate that Mr. Washington had flat mood/affect; calm thought process/orientation; and cooperative behavior/functioning. (Tr. 611.)

### D.  Relevant Statements and Hearing Testimony

#### 1.  *Mr. Washington's Hearing Testimony*

Mr. Washington testified that he typically only leaves the house to go the store or to appointments. (Tr. 41.) He was able to use the bus system when he lived in Cleveland, but he does not use the Toledo bus system because he does not know how it works and does not know his way around. (*Id.*) His mom usually got a cab to take him to his appointments. (*Id.*) Mr. Washington testified that he stopped working due to his mental health conditions and diabetes. (Tr. 45.) He stated that he had not taken medications for his mental health for about two to three months due to transportation issues that prevented him from keeping appointments with his psychiatrist. (Tr. 46-47.) Mr. Washington, however, then restated that most of the time his mom would call a cab to arrange transportation to his appointments. (Tr. 47.) He testified that he notices a difference in his mental health symptoms without his medications, including social isolation and changes in his mood around other people. (Tr. 48.)

Mr. Washington testified that he normally does not have any problems with hallucinations. (Tr. 48-49.) But he also testified that he always feels like someone is watching him or talking about him, including his friends and family. (Tr. 54-55, 58-59.) He stated that he also felt like people intended to harm him and alleged that his cousin's girlfriend threatened him and sent him hateful messages. (Tr. 55.) He stated that he did not fight with his mom, but they did not get along that well. (Tr. 48.) He also said that he avoided his sister by staying in his room. (*Id.*) Mr. Washington testified that he spends his days in his room watching shows on his computer, talking to his cousins and friends on the computer, playing video games with other people online, walking his dogs around the corner once or twice per week when he is not depressed, and cooking meals for himself. (Tr. 50-53, 55-56.)

12

## 2. *Vocational Expert's Hearing Testimony*

The ALJ first asked the VE whether an individual with Mr. Washington's age, education, and experience could perform his past relevant work if he could never climb ladders, ropes, or scaffolds; never be exposed to unprotected heights or heavy moving machinery; can understand, remember, and carry out simple instructions; perform simple routine and repetitive tasks, but not at a production-rate pace; cannot do work requiring hourly production quotas; can occasionally adapt to changes in routine job duties; can use judgment to make simple work-related decision; can interact occasionally with supervisors and coworkers; and can never interact with the general public. (Tr. 61-62.) The VE opined the individual could not perform his past relevant work but could perform work as a hand packager, cleaner II, and a hospital cleaner. (Tr. 62.)

The ALJ then asked the VE whether the individual could perform work if he were off task more than 10 percent of the workday due to symptoms. (*Id.*) The VE opined that this limitation would be work-preclusive. (*Id.*) The ALJ also asked whether an individual could perform work if he would be consistently absent two days per month. (Tr. 63.) The VE opined that this limitation would be work-preclusive. (*Id.*) Mr. Washington's counsel asked the VE whether the individual could perform work if he had to take two additional five-minute breaks in the morning and the afternoon. (Tr. 63.) The VE opined that this would be work-preclusive. (Tr. 64.)

## IV. THE ALJ'S DECISION

The ALJ first determined Mr. Washington meets the insured status requirements of the Social Security Act through June 30, 2025. (Tr. 19.) The ALJ then determined that Mr. Washington had not engaged in substantial gainful activity since June 30, 2020, the amended alleged onset date. (*Id.*) The ALJ further determined that Mr. Washington has the following severe impairments: depressive/mood disorder; personality disorder; post-traumatic stress disorder; paranoid

schizophrenia; obsessive compulsive disorder; and diabetes mellitus. (Tr. 19-20.) However, the ALJ determined that none of these impairments—either individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20-21.)

The ALJ determined that Mr. Washington has the residual functional capacity ("RFC") to perform at all exertional levels but had the following nonexertional limitations: he can never climb ladders, ropes, and scaffolds; never be exposed to unprotected heights or heavy moving machinery; can understand, remembers, and carry out simple instructions; perform simple, routine, and repetitive tasks, but not at a production rate pace such as an assembly line, or work requiring hourly production quotas; can occasionally adapt to changes in routine job duties; can use judgment to make simple, work-related decisions; and can interact occasionally with supervisors and coworkers; can never interact with the general public. (Tr. 21-25.) The ALJ then determined that Mr. Washington is unable to perform his past relevant work as a stock clerk, setup mechanic, and cashier. (Tr. 25.) The ALJ further determined that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Mr. Washington is not disabled. (*Id.*)

The ALJ also determined that, considering Mr. Washington's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Mr. Washington can perform such as employment as a hand packager and hospital cleaner. (Tr. 25-26.) Accordingly, the ALJ concluded that Mr. Washington was not disabled within the meaning of the Social Security Act since his amended alleged disability onset date through the date of the ALJ's decision. (Tr. 27.)

## V.      LAW AND ANALYSIS

### A.  **Standard of Review**

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

C. **Analysis**

    1. ***The ALJ properly evaluated the opinions of Dr. Reese and the state agency psychological consultants.***

Mr. Washington argues that the ALJ erred in evaluating statements from Dr. Reese and the state agency psychological consultants. These arguments are not well-taken because the statements were not medical opinions.

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

"If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. "It is well-established that an ALJ need not adopt all findings in a medical opinion when determining an RFC." *Fiktus v. Kihakazi*, No. 1:20CV1689, 2021 WL 5567866, at *9 (N.D. Ohio July 29, 2021) (citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009)), *report and recommendation adopted sub nom. Fiktus v. Comm'r of Soc. Sec.*, 2021 WL 5566805 (N.D. Ohio

Nov. 29, 2021). However, the ALJ is still required to explain why he did not adopt a portion of an opinion if the RFC conflicts with it. *Kearns v. Comm'r of Soc. Sec.*, No. 3:19 CV 01243, 2020 WL 2481707, at *13 (N.D. Ohio Feb. 3, 2020).

### a. The ALJ properly evaluated the statements from Dr. Reece.

Mr. Washington argues that the ALJ failed to properly evaluate the medical opinion of Dr. Reese. Dr. Reece stated that Mr. Washington was able to follow directions, he had "some to minimal social support," and his current deficits in dealing with stress and pressure in the workplace are emotional instability, anxiety, and depression. (Tr. 554-55.) The ALJ stated Dr. Reece's statements "do not quantify specific limitations in the areas identified by the examiner." (Tr. 24.) The ALJ, however, found these statements persuasive, as they were generally consistent with the record as a whole. (*Id.*) Mr. Washington contends that the ALJ erred because he did not properly indicate how the limitations were accommodated by the RFC.

The Commissioner disagrees. (ECF No. 11, PageID#788-90.) Specifically, the Commissioner contends that ALJ correctly determined that Dr. Reece did not quantify specific limitations. (*Id.* at PageID#789). The Commissioner asserts that this is because much of Dr. Reece's functional assessment was a "re-statement of [Mr. Washington's] subjective reports." (*Id.*) The Commissioner also argues that Dr. Reece's statements failed to provide specific work-related functional limitations, meaning that these statements were not a medical opinion for which the ALJ was required to provide persuasive analysis. (*Id.*) On reply, Mr. Washington contends that the Commissioner's assertion that Dr. Reece's statement is a mere re-statement of his subjective reports is an improper *post-hoc* rationalization. (ECF No. 12, PageID#800.)

Here, the Commissioner has in part provided a *post hoc* rationalization of the ALJ's decision. Although the ALJ determined that Dr. Reese's opinion did not quantify specific

limitations, the ALJ did not determine that this was attributable to Dr. Reese merely re-stating Mr. Washington's symptoms. And to some extent, it does appear that some of Dr. Reese's statements stemmed from his personal observations from the consultative examination rather than just mere re-statements of Mr. Washington's reported symptoms. For example, Dr. Reese noted that Mr. Washington "was able to follow directions in the exam." (Tr. 555.) Thus, this appears to be an improper *post hoc* rationale offered by the Commissioner, rather than a rationale offered by the ALJ himself. *See Holliman v. Comm'r of Soc. Sec. Admin.*, No. 1:15-CV-699, 2016 WL 1739979, at *8 (N.D. Ohio Apr. 7, 2016), *report and recommendation adopted sub nom. Holliman v. Comm'r of Soc. Sec.*, 2016 WL 1704339 (N.D. Ohio Apr. 27, 2016) ("[T]his rationale is asserted only by the government, and may not be considered to explain what the ALJ may have been thinking when she determined Plaintiff's statements lacked credibility.").

But there is no error in the ALJ's analysis of Dr. Reece's unquantified limitations. Mr. Washington appears to take issue with how the ALJ articulated how he ultimately incorporated the vague, unquantified limitations from Dr. Reece into the RFC. Dr. Reece, however, merely stated that Mr. Washington "was able to follow directions, and had minimal social supports," and "current deficits in dealing with stress and pressure in the workplace" arising from emotional instability, anxiety, and depression. (Tr. 554-55.) The ALJ therefore correctly concluded that Dr. Reece failed to quantify specific limitations in the identified areas. (Tr. 24.)

As noted previously, when an ALJ receives medical opinions, he is required to articulate how persuasive he finds them. 20 C.F.R. § 404.1520c(a). A medical opinion is "a statement from a medical source about what an individual c[an] still do despite their impairments **and** whether they have one or more impairment-related limitations or restrictions in their ability to perform physical, or mental demands of work activities." 20 C.F.R. § 404.1513(a)(2) (emphasis added).

19

None of Dr. Reece's statements provide any opinion as to specific work-related functional limitations. *Harper v. Comm'r of Soc. Sec.*, No. 5:21-CV-01078, 2022 WL 3028094, at *2 (N.D. Ohio Aug. 1, 2022) ("Dr. Offutt's failure to specify any work activity Harper could still do despite her impairments is reason enough to conclude that the information provided by Dr. Offutt is not a medical opinion according to the applicable regulations."). Thus, Dr. Reese's statements were not a medical opinion that the regulations require an ALJ to analyze.

Finally, to the extent that Mr. Washington alleges that the ALJ failed to properly take into account the vague limitations from Dr. Reece, this argument is unpersuasive. That is because "where a plaintiff challenges an ALJ's mental-health related findings but does not explain what limitations the ALJ erred in excluding or point to any evidence from within the applicable period suggesting that she had additional mental-health related restrictions, then the plaintiff's challenge is meritless." *Ware v. Comm'r of Soc. Sec.*, No. 2:17-CV-01015, 2019 WL 696945, at *11 (S.D. Ohio Feb. 20, 2019), *report and recommendation adopted*, 2020 WL 2085200 (S.D. Ohio Apr. 30, 2020). Here, Mr. Washington does not explain what additional vocationally relevant functional limitations should have been incorporated or otherwise offered any evidence or authority suggesting that Dr. Reese's statements merited specific RFC limitations. Accordingly, this assignment of error lacks merit.

### b. The ALJ was not required to evaluate the persuasiveness of the state agency consultants' recommendations.

Mr. Washington also argues that the ALJ failed to properly evaluate the statements of the state agency psychological consultants. (ECF No. 7, PageID#770-71.) Specifically, the state agency consultants stated the following: "Given [Mr. Washington's] depression, voc[ational] rehab[ilitation] assistance in helping him to find appropriate work activity is recommend as he's seeking out support that is likely needed due to his depressed mood limiting his ability to engage

in future planning." (Tr. 76, 86.) Mr. Washington contends that the ALJ's decision "simply does not mention, let alone address, this aspect of the [state agency psychological consultants'] findings, despite finding this opinion persuasive." (ECF No. 7, PageID#771.) Mr. Washington asserts that there is no evidence that he can perform the VE's identified jobs if he requires vocational assistance. (*Id.*) The Commissioner argues that the ALJ did not need to evaluate the persuasiveness of this statement because the state agency consultants provided a recommendation rather than a medical opinion. (ECF No. 11, PageID#790.) The Commissioner's argument is well-taken.

The state agency consultants' statements do not rise to the level of a medical opinion. A medical opinion is "a statement from a medical source about what an individual c[an] still do despite their impairments ***and*** whether they have one or more impairment-related limitations or restrictions in their ability to perform physical, or mental demands of work activities." 20 C.F.R. § 404.1513(a)(2) (emphasis added). Here, the state agency consultants recommended that Mr. Washington obtain assistance from vocational rehabilitation because he "likely needed" help to find appropriate work activity. (Tr. 76, 86).

This recommendation is not a medical opinion because it is not a work-related functional limitation. Significantly, the agency consultants' statements do not opine *any* limitations in his ability to perform *work-related activities*. 20 C.F.R. § 404.1513(a)(2); *see Workman v. Comm'r of Soc. Sec.*, No. 3:23-CV-01167-JRK, 2024 WL 2941180, at *7-8 (N.D. Ohio Apr. 26, 2024), *report and recommendation adopted*, 2024 WL 2873278 (N.D. Ohio June 7, 2024) (finding that medical source's recommendation, among several recommendations, that plaintiff "may need a support system in place to help him be able to find and keep a job" was not a medical opinion because the statement did not demonstrate what job functions plaintiff was still able to perform). Accordingly,

the ALJ was not required to assess the persuasiveness of this recommendation because it is not a medical opinion. 20 C.F.R. § 404.1520c(a).

Finally, Mr. Washington's argument that "[t]here is no evidence that [he] can perform the jobs identified by the VE if he requires vocational assistance" is unavailing. (ECF No. 7, PageID#771.) That is because the state agency consultants *did not* indicate that Mr. Washington would need vocational assistance to perform the requirements of a particular job. Rather, the state agency consultants stated that Mr. Washington would "likely need" help to find an appropriate job. (Tr. 76, 86.) Accordingly, this assignment of error lacks merit because Mr. Washington fails to establish any error in the ALJ's consideration of the statements from Dr. Reece and the state agency consultants.

### 2. *Substantial evidence supports the ALJ's evaluation of Mr. Washington's social limitations.*

Mr. Washington asserts that the ALJ erred by failing to consider the impact of his paranoia on his ability to interact with others. (ECF No. 7, PageID#772-73.) Specifically, he contends that the ALJ failed to explain why he found Mr. Washington could not interact with the general public but could occasionally interact with supervisors and co-workers. (*Id.* at PageID#773.) The Commissioner contends that substantial evidence supports the ALJ's evaluation of Mr. Washington's social limitations. (ECF No. 11, PageID#791-96.) The Commissioner further argues that Mr. Washington failed to cite to any evidence showing difficulty getting along with co-workers or supervisors due to his paranoia, even though he was engaged in work activity during the period at issue. (*Id.* at PageID#795-96.) The Commissioner's arguments are well-taken.

In the instant case, the ALJ provided, in relevant part, the following mental RFC determination:

> [Mr. Washington] can understand remember, and carry out simple instructions; perform simple, routine, and repetitive tasks, but not at a production rate pace such as an assembly line, or work requiring hourly production quotas; can occasionally adapt to changes in routine job duties; can use judgment to make simple, work-related decision; and can interact occasionally with supervisors and coworkers, and never with the general public.

(Tr. 21.)

In reaching this determination, the ALJ discussed at length evidence related to Mr. Washington's social functioning. For example, the ALJ specifically discussed Mr. Washington's testimony that he always felt like people were talking about him and Mr. Washington's report that he experienced some anger, irritability, and anxiety around others. (Tr. 20-23; *see* Tr. 551-52, 565.) The ALJ also discussed Mr. Washington's mental status examinations, which, at times, showed abnormal eye contact (*i.e.*, poor, avoidant, and/or inconsistent), hesitant speech, mild psychomotor retardation, abnormal mood (dysphoric and/or anxious), and abnormal affect (flat, restricted, and/or constricted). (Tr. 21-23; *see* Tr. 331, 345, 453-54.)

But the ALJ also noted Mr. Washington's testimony that he was able to take public transportation and spend time with his cousins online through an app called Discord. (Tr. 22.) The ALJ further mentioned other mental status examination findings, such as normal thought processes (organized, logical, goal-directed, and/or well-organized), normal behavior (pleasant, cooperative, and/or cheerful), normal speech, normal mood (euthymic and/or claim), and normal affect. (Tr. 21, 23; *see* Tr. 345, 454-54, 552-53, 557, 565, 603, 611, 613); *see* 20 C.F.R. § 404.929(c)(2) (noting that objective medical evidence is a "useful indicator to assist [the ALJ] in making reasonably conclusions about the intensity and persistence of [the claimant's] symptoms and the effect of those symptoms…may have on [the claimant's] ability to work"); 20 C.F.R. § 404.929(c)(2) (4) (An ALJ will "consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of

the evidence, including [the claimant's] history, the signs and laboratory findings, and statements by [the] medical sources or other persons about how [the claimant's] symptoms affect [the claimant].")

Additionally, the ALJ considered the efficacy of Mr. Washington's treatment. *See* 20 C.F.R. § 404.1529(c)(3)(i). Specifically, the ALJ observed that Mr. Washington was prescribed Haldol (Tr. 23; *see* Tr. 346, 551), which was a medication used to treat Mr. Washington's paranoia (Tr. 345). The ALJ also discussed Mr. Washington's testimony that he was not currently taking psychotropic medications due to transportation issues and his testimony that he noticed a difference without the medication, stating that he had a hard time getting along with family members. (Tr. 20, 22.)*; see* 20 C.F.R.§ 404.1529(c)(3)(iv) (An ALJ must consider the effectiveness of treatment); *Smith v. Comm'r of Soc. Sec.*, 564 F. App'x 758, 763 (6th Cir. 2014) (disability not supported when impairments are improved with medications) (citations omitted))

Moreover, the ALJ discussed Mr. Washington's reported daily activities, especially those that required interactions with others, such as running errands, shopping, taking public transportation, and spending time with his cousins through an app. (Tr. 21-23; *see* Tr. 552.) *See* 20 C.F.R. 404.1529(c)(3)(i). The Sixth Circuit has recognized that daily activities are an appropriate factor that an ALJ may consider when assessing the consistency of a claimant's allegations. *See Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). In this decision, the ALJ discussed that Mr. Washington engaged in non-SGA work activity after his alleged disability onset date. (Tr. 19; *see* Tr. 194.) *See* 20 C.F.R. § 404.1571 ("Even if the work [the claimant has] done was not substantial gainful activity, it may show that [the claimant is] able to do more than [the claimant] actually did."). Specifically, Mr. Washington reported that he worked

as a driver from Amazon prior to the period at issue and into the period at issue and this job ended due to the COVID-19 pandemic. (Tr. 268, 330.)

Mr. Washington takes issue with the ALJ's discussion of Mr. Washington spending time with his cousins through the Discord app because he also testified that he "feels like they are against him." (ECF No. 12, PageID#803 (citing Tr. 54-55)). And he also points to his reports to the consultative psychologist that he had "no socialization…[and that he] did [not] participate in any social structured activities." (ECF No. 12, PageID#803 (citing Tr. 552)). Thus, Mr. Washington contends that the ALJ's reliance on the other allegedly minimal activities was error.

But the ALJ here did not base his RFC determination solely on Mr. Washington's daily activities. Rather, the ALJ also considered the findings from state agency psychological consultants who evaluated evidence pertaining to Mr. Washington's paranoia yet still concluded that he could interact with others. (Tr. 24; *see* Tr. 69-72, 80-82.) The ALJ found the state agency findings persuasive, noting that they found that Mr. Washington was able to get along with others and sustain contact with coworkers and supervisors, though he would not do well in a customer service position. (Tr. 24; *see* Tr. 76, 86.) And the ALJ's RFC determination was consistent with these opinions. Indeed, the ALJ determined that Mr. Washington could interact occasionally with supervisors and coworkers and never with the general public. (Tr. 21.)

"An RFC determination that is supported by the medical opinions of state agency physicians is generally supported by substantial evidence." *Sittinger v. Comm'r of Soc. Sec.*, No. 1:22-CV-01927-BYP, 2023 WL 6219412, at *13 (N.D. Ohio Sept. 7, 2023), *report and recommendation adopted sub nom. Sittinger v. Soc. Sec. Admin.*, 2023 WL 6214530 (N.D. Ohio Sept. 25, 2023); *see also Maldonado o/b/o A.C. v. Kijakazi*, No. 4:20-CV-1878, 2022 WL 361038, at *6 (N.D. Ohio Jan. 14, 2022)), *report and recommendation adopted sub nom. Maldonado o/b/o*

*A.C. v. Comm'r of Soc. Sec.*, 2022 WL 356557 (N.D. Ohio Feb. 7, 2022) ("There is ample case law conclude that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision.") (collecting cases).

Mr. Washington bears the burden to present evidence showing that he was disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). This burden requires that he provide evidence demonstrating his RFC and show how his impairments affected his functioning during the relevant period. *See* 20 CFR. § 404.1545(a)(3) (stating that claimant is "responsible for providing the evidence [the agency] will use to make a finding about [the claimant's] RFC"); 20 C.F.R. § 404.1512(a) (claimant has the burden of showing how their impairments affects their functioning during the time they allege they are disabled). Here, Mr. Washington fails to meet this burden.

Specifically, he does not demonstrate that he had difficulty interacting with co-workers or supervisors due to his paranoia, despite the fact that he worked during the period at issue. And the record also suggests that he had no difficulty interacting with co-workers and supervisors. For example, at a consultative examination with Dr. Reece, Mr. Washington denied any previous problems with his co-workers and supervisors and reported having no problems as an adult with neighbors or people in authority. (Tr. 550, 552, 555.) And, as discussed above, Mr. Washington worked part-time prior to the alleged disability onset date as an Amazon driver. This job ended not due to difficulties but because of the COVID-19 pandemic. (Tr. 268, 330.) Moreover, Mr. Washington primarily reported paranoia and difficulties with social interactions related to his family, which he testified was exacerbated when he did not take his medication. (Tr. 48, 54-55, 58-59, 331, 453, 456, 461, 464, 476, 485, 495, 576.)

Notably, there are *no* opinions assessing any greater social limitations from Mr. Washington's treating or examining providers. *See Parrish v. Berryhill*, No. 1:16-cv-1880, 2017

WL 2728394, at *8 (N.D. Ohio June 8, 2017), *report and recommendation adopted sub nom. Parrish v. Comm'r of Soc. Sec.*, 2017 WL 2720332 (N.D. Ohio June 23, 2017) ("Plaintiff's brief also does not identify a single opinion from a treating, acceptable medical source concerning Plaintiff's functional limitations that is inconsistent with the RFC or the State agency opinions."); *Quinn v. Comm'r of Soc. Sec.*, No. 1:23-CV-00029-CEH, 2024 WL 183960, at *8 (N.D. Ohio Jan. 17, 2024) ("As correctly argued by the Commissioner, Claimant fails to point to any medical opinion with more restrictive limitations than those considered by the RFC.").

Mr. Washington argued for the first time in his reply brief that the ALJ engaged in impermissible cherry picking. (ECF No. 12, PageID#802.) This assertion is an improper attempt to recast his merits brief argument because, as discussed above, Mr. Washington alleged in his opening brief that the ALJ "failed to build a logical bridge between his analysis and his conclusions." (ECF No. 7, PageID#773). Mr. Washington took issue with whether the ALJ provided *sufficient explanation for his conclusion* regarding Mr. Washington's social limitations, *not* that the ALJ cherry picked the record in support of his conclusion. (*See id.* at PageID#772-73.) It is well-established that a party should not raise new arguments in a reply brief. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). Thus, this argument is waived.

And even if this argument were not waived, it is nevertheless unpersuasive. An ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where ALJ failed "to address certain portions of the record, including evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications."). Yet, "the ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10-cv-1017,

2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011). The Sixth Circuit has explained that allegations of cherry picking evidence by the ALJ are "seldom successful crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)).

It is well settled that an ALJ need not discuss every piece of evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony so long as his factual findings as a whole show that he implicitly resolved such conflicts."). Mr. Washington identifies portions of the record involving his paranoia and his irritability with others that he asserts, in a lay opinion, would have potentially supported more restrictive social limitations in the RFC determination than found by the ALJ.

While the ALJ did not discuss every piece of evidence that Mr. Washington cites, a review of the ALJ's decision reflects—for the reasons set forth at length above—that he considered Mr. Washington's testimony and reports regarding his social limitations, including his mental status examination findings, treatment regimen, activities of daily living, and work activity after his onset date in the context of resolving Mr. Washington's claims.  Reading the decision as a whole, the ALJ considered the evidence of the record—both favorable and unfavorable evidence—in his decision. The "law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC." *Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted sub nom. Byler v. Comm'r of Soc. Sec. Admin.*, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022).  Here, the ALJ built a "clear and logical bridge" between the evidence and his conclusions. The ALJ then reasonably accounted for Mr.

Washington's social limitations by finding that he could interact occasionally with supervisors and coworkers and never with the general public. (Tr. 21.)

The substantial evidence standard does not call for the plaintiff to present evidence that supports a mere feasible interpretation. *See Dornan v. Comm'r of Soc. Sec.*, No. 1:22-CV-02244-JRA, 2023 WL 8789168, at *11 (N.D. Ohio Dec. 4, 2023), *report and recommendation adopted*, 2023 WL 8780713 (N.D. Ohio Dec. 19, 2023) ("Pointing to evidence demonstrating another feasible interpretation does not establish the ALJ's decision is not supported by substantial evidence."). That is because, even if there is substantial evidence in the record that would have supported an opposite conclusion, this Court must affirm if the ALJ's decision is supported by substantial evidence. *See Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 533 (6th Cir. 2014). The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Here, Mr. Washington does not meet his burden. Accordingly, this assignment of error lacks merit.

## VI.  CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's final decision denying Mr. Washington's DIB application.

**IT IS SO ORDERED.**

Dated: August 2, 2024                                        */s Jennifer Dowdell Armstrong*
                                                              Jennifer Dowdell Armstrong
                                                              U.S. Magistrate Judge